UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| TONY SERRANO, | ) |
|     Petitioner, | ) ) ) |
|     v. | ) No. 13 C 6576 ) |
| TERI KENNEDY, Pontiac Correctional Center,[1] | ) Judge Sara L. Ellis ) ) ) |
|     Respondent. | ) ) |

## OPINION AND ORDER

Petitioner Tony Serrano, currently incarcerated at Pontiac Correctional Center, is serving an 85-year sentence for first degree murder. Serrano has petitioned this Court for a writ of habeas corpus under 28 U.S.C. § 2254. Serrano's claim that the trial court did not properly question prospective jurors as required by Illinois Supreme Court Rule 431(b) is not a cognizable claim. Moreover, Serrano has procedurally defaulted both his claim that his trial counsel was ineffective for failing to ensure that prospective jurors were questioned regarding gang bias and that the trial court improperly denied defense counsel's motion to withdraw. Finally, although the Court reaches his ineffective assistance of counsel claim regarding suppressing his initial statements to the police officer and prosecutor on the merits, Serrano has not shown that the state court's decisions on these issues were contrary to or an unreasonable application of clearly established federal law. Thus, the Court denies Serrano's petition.

---

[1] Teri Kennedy is presently the warden at Pontiac Correctional Center, where Serrano is incarcerated, and so the Court substitutes her as the proper Respondent in this matter. *See* Rule 2(a) of the Rules Governing Section 2254 Cases in the United States District Courts.

# BACKGROUND

The Court will presume that the state court's factual determinations are correct for the purposes of habeas review, as Serrano has not pointed to clear and convincing evidence to the contrary. *See* 28 U.S.C. § 2254(e)(1); *Todd v. Schomig*, 283 F.3d 842, 846 (7th Cir. 2002). The Court thus adopts the state court's recitation of the facts and begins by summarizing the facts relevant to Serrano's petition.

## I.     Serrano's Trial and Conviction

On June 25, 2007, members of two rival gangs, the Imperial Gangsters and the Spanish Cobras, gathered across the street from each other near Funston Park in Chicago. The gang members shouted insults at each other. As the argument intensified, one of the gang members pulled out a gun and began shooting. One of the bullets hit 13-year-old Shanna Gayden, a passerby on her way with her cousin to buy a watermelon from a local vendor in the park. The bullet killed her.

According to the testimony of Chicago police officer Edwin Pagan, his investigation of the scene indicated that Mwenda Murithi might have been present at the shooting. Pagan was already familiar with Murithi from the area. While canvassing the neighborhood, Pagan found Murithi half a block away from the park drinking an alcoholic beverage outside. Pagan placed Murithi under arrest for drinking on a public way, and Murithi asked Pagan to "give [him] a break" in exchange for some information about the shooting. Doc. 30-1, Ex. A at 4. Before Pagan had time to respond or read Murithi his *Miranda* rights, Murithi informed Pagan that the 9mm gun used in the shooting was stored at 3503 West Dickens. Pagan advised Murithi of his *Miranda* rights, and Murithi then told Pagan that an Imperial Gangster gang member named Tony was the shooter. Murithi further stated that the shooter fired six rounds, leaving one in the

gun's clip. According to Pagan, he already knew that the shooting involved six 9mm cartridge casings based on his investigation of the shooting scene.

Pagan testified that he then brought Murithi with him to 3503 West Dickens to look for suspects. There, Pagan saw Serrano and a few other people on the back porch. Serrano responded to the name Tony, and Pagan then arrested him. Murithi identified Serrano as the shooter, and Pagan brought both men to the Area 5 police station.

Chicago police detective John Valkner testified that, at the station, he questioned Serrano for the first time at 1:30 a.m. on June 26. The interview lasted 15 minutes. Valkner read Serrano his Miranda rights. Serrano then told Valkner that he was 19 years old and joined the Imperial Gangsters three months ago. He had lived at 3503 West Dickens for the past eight months. Valkner told Serrano that someone identified him as the shooter, and Serrano admitted that a member of his gang told him to take a gun for Murithi to the street where the gang members were arguing, which Serrano did. When he arrived, Murithi ordered him to shoot at the Spanish Cobras. Serrano hesitated, and Murithi asked for the gun. Serrano then shot several shots at the Cobras. Afterward, he ran back to his house, changed from the black, multi-colored crown shirt that he had been wearing, and returned the gun to its hiding place. Valkner then requested Serrano's consent for the police to search his house, and Serrano signed the consent form. The police recovered a black shirt with a multi-colored crown that Serrano described but did not recover a gun.

Assistant States Attorney Aaron Bond testified that he arrived at the police station to question Serrano at 2:40 a.m. Upon arrival, he asked detectives to check if Gayden was still alive. He did not learn of her condition before interviewing Serrano at 3:15 a.m., where Serrano provided information consistent with the information he had already provided to Valkner. After

the interview, just before 4:00 a.m., Valkner and Bond discovered that Gayden had died at approximately 12:10 a.m. They videotaped remaining interviews with Serrano.

The State charged Serrano and Murithi as co-defendants for Gayden's murder. On February 7, about two weeks before trial, Serrano's counsel moved to withdraw from the case because Serrano's family had stopped paying his legal fees. The prosecution objected, arguing that the case had already been moved to February to accommodate defense counsel and that it had witnesses flying in from the Netherlands and other parts of the United States. The trial court asked Serrano if he wanted to be represented by defense counsel, and he said yes. The trial court also found out that Serrano's family had already paid approximately $20,000 in fees. The trial court denied the motion on the basis that the motion was too late and Serrano had already paid a large sum of money for representation. Defense counsel objected, saying "I don't think I could be effective without the assistance . . ." but was cut off by the trial court. Doc. 30-1, Ex. A at 26–27. Defense counsel remained in the case.

Although Serrano did not file any pretrial motions, Murithi filed motions to quash arrest, suppress evidence, and suppress statements. The trial court denied all three motions. At trial, in addition to testimony from Pagan,[2] Valkner, and Bond, several other witnesses testified regarding Serrano and Murithi's role in the shooting. Felix Jusino testified that he was a member of the Imperial Gangsters at the time, and he ran into Murithi about 20 minutes before the shooting. Murithi asked him to come with him because there were Spanish Cobras nearby. Jusino declined, telling Murithi that he was busy helping his mother, and Murithi left. While at a nearby store, Jusino heard people yelling "Cobra killer" outside. He went to see what was happening and saw Murithi yelling "Cobra killer" and using hand signals "dropping the C," a

---
[2] Some of the details from Pagan's testimony came out in pretrial motions, but his testimony at trial was substantially similar (albeit less detailed).

4

sign of disrespect. Doc. 30-1, Ex. A at 5. Jusino also saw Serrano behind Murithi. While Murithi argued with the Spanish Cobras, Serrano went behind a car, stepped out from behind the car, and began shooting at the Cobras. Afterward, he ran, and Jusino saw a pistol in Serrano's hand as he ran away.

Jacoby Jones testified that he was walking near the park with his sister when he saw Murithi flashing gang signs and yelling "Cobra killer" at some Spanish Cobra members across the street. Jones heard Murithi say "bring the thumper," which he understood to be slang for gun, and so he picked up his sister and ran to his house. Doc. 30-1, Ex. A at 6. A few seconds later, Jones heard six to eight gunshots. Jones identified Murithi in a photo array and a lineup.

Roquelin Bustamante testified that he saw three black men, including Murithi, flashing gang signs and shouting at four Hispanic men across the street from each other. Bustamante then saw a Hispanic man step out from behind a car and pull out a gun from under his shirt. Murithi waved at the man with the gun and told him to "wreck 'em." Doc. 30-1, Ex. A at 7. Bustamante identified Murithi in a lineup but could not identify Serrano.

Finally, 21-year-old Jonathan Lopez testified that he was also a member of the Imperial Gangsters and knew Serrano through the gang. Lopez had been convicted of unlawful use of a weapon and was on parole when he testified, and he declined to speak with defense counsel prior to trial. According to Lopez, on June 22, 2007, Serrano brought Lopez into the basement of his house and showed him a black 9mm semiautomatic gun. Then, around seven in the evening on the day of the shooting, Serrano told Lopez on his back porch that he shot a little kid while shooting at some Spanish Cobras. After this conversation, the police came and arrested Serrano.

5

A jury found Serrano guilty of first degree murder and of discharging a firearm that proximately caused Gayden's death. The trial court sentenced Serrano to 60 years for murder and a 25-year mandatory consecutive sentence for discharging the firearm.

## II. Direct Appeal

With the assistance of counsel, Serrano appealed to the Illinois Appellate Court. He raised ten claims in the appeal; those relevant for the purposes of this petition are: (1) that his trial counsel was ineffective for failing to suppress his initial statements to Valkner and Bond on the basis that they did not record the statements, the statements were made after Gayden died, and Valkner and Bond should have known that Gayden had died, (2) that his trial counsel was ineffective for failing to ensure that prospective jurors were questioned regarding possible gang bias, (3) that the trial court erred when it denied defense counsel's motion to withdraw and did not question Serrano regarding the potential conflict of interest in counsel's continued representation, and (4) that the trial court erred when it did not question jurors as required by Illinois Supreme Court Rule 431(b). On June 30, 2011, the Illinois Appellate Court affirmed Serrano's convictions. Serrano filed a motion to reconsider, which the Illinois Appellate Court denied.

Serrano then filed a petition for leave to appeal ("PLA") with the Illinois Supreme Court. In the PLA, Serrano argued that his trial counsel was ineffective for failing to suppress his initial statements and that the trial court erred by failing to inform and question jurors as required by Rule 431(b). Serrano also raised other claims not at issue in this petition. The Illinois Supreme Court denied the PLA on September 26, 2012. Serrano did not file a postconviction appeal or other collateral attack on his conviction in state court.

## LEGAL STANDARD

A habeas petitioner is entitled to a writ of habeas corpus if the challenged state court decision is either "contrary to" or "an unreasonable application of" clearly established federal law as determined by the United States Supreme Court or if the state court decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1)–(2). A state court decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law" or "if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to [the Court]." *Williams v. Taylor*, 529 U.S. 362, 404–05, 120 S. Ct. 1495, 146 L. Ed 2d 389 (2000). An "unreasonable application" of federal law occurs if the state court correctly identified the legal rule but unreasonably applied the controlling law to the facts of the case. *See id.* at 407. Whether a state court's application of Supreme Court precedent is unreasonable is judged by an objective standard. *Id.* at 409; *Winston v. Boatwright*, 649 F.3d 618, 624 (7th Cir. 2011).

## ANALYSIS

Serrano asserts four grounds for relief: (1) that trial counsel was ineffective for failing to move to suppress the initial statements he made to the government; (2) that trial counsel was ineffective for failing to ensure that prospective jurors were questioned regarding possible gang bias; (3) that the trial court erred when it denied trial counsel's motion to withdraw and did not adequately question Serrano regarding potential conflict of interest in trial counsel continuing to represent him; and (4) that the trial court erred when it did not question jurors as required by Illinois Supreme Court Rule 431(b). Respondent argues that claim 4 is not cognizable on federal

habeas review and that Serrano procedurally defaulted it along with claims 2 and 3, and that the state court adjudicated claim 1 on the merits.

## I. Cognizability (Claim 4)

Serrano's fourth claim is that the trial court erred when it did not ask the potential jurors if they understood and accepted the four principles articulated in *People v. Zehr*, 469 N.E.2d 1062, 1064, 103 Ill.2d 472, 83 Ill. Dec. 128 (1984), in violation of Illinois Supreme Court Rule 431(b). Respondent argues that (1) the claim is not cognizable, and (2) Serrano procedurally defaulted this claim because the state court's decision on that claim rests on an independent and adequate state ground.

"The remedial power of a federal habeas court is limited to violations of the petitioner's federal rights, so only if a state court's errors have deprived the petitioner of a right under federal law can the federal court intervene." *Perruquet v. Briley*, 390 F.3d 505, 511 (7th Cir. 2004). "To say that a petitioner's claim is not cognizable on habeas review is thus another way of saying that his claim 'presents no federal issue at all.'" *Id.* (citation omitted). Here, Serrano's claim that the trial court violated Illinois Supreme Court Rule 431(b) does not entitle him to federal habeas review. "Federal law does not require that prospective jurors be affirmatively asked if they agree with the *Zehr* principles—a point noted by the many federal judges in this circuit who have rejected claims identical to Petitioner's." *United States ex rel. Murithi v. Butler*, 14-v-3090, 2015 WL 1399511, at *12 (N.D. Ill. Mar. 23, 2015) (citing *Rosario v. Akpore*, 967 F. Supp. 2d 1238, 1250 (N.D. Ill. 2013)). Because claim 4 is not a cognizable claim, the Court cannot review it.[3]

---

[3] Because claim 4 is not cognizable, the Court need not reach the parties' arguments regarding procedural default. Serrano argues that the Illinois Appellate Court ignored his argument on direct appeal that the trial court's actions regarding this issue constituted error under the first prong of the plain error doctrine— in spite of his arguments that the evidence was closely balanced, the Appellate Court concluded,

## II.     Procedural Default (Claims 2 and 3)

A petitioner must fairly present his claims to all levels of the Illinois courts to avoid procedural default. *See O'Sullivan v. Boerckel*, 526 U.S. 838, 848, 119 S. Ct. 1728, 144 L. Ed. 2d 1 (1999). To be "fairly presented," a petitioner must bring his claim through one complete round of state court review, either on direct appeal or in post-conviction proceedings. *Lewis v. Sternes*, 390 F.3d 1019, 1025 (7th Cir. 2004). In Illinois, this means appeals up to and including the filing of a PLA to the Illinois Supreme Court. *O'Sullivan*, 526 U.S. at 845–46; *Duncan v. Hathaway*, 740 F. Supp. 2d 940, 945 (N.D. Ill. 2010). When a petitioner has failed to present his federal claim to the state courts and the opportunity to raise that claim has subsequently passed, the petitioner has procedurally defaulted the claim and it is not available for federal habeas review. *Gonzales v. Mize*, 565 F.3d 373, 380 (7th Cir. 2009).

A petitioner may nonetheless pursue a procedurally defaulted claim if he can establish cause for the default and actual prejudice as a result of the alleged violation of federal law or can demonstrate that this Court's failure to consider the claim will result in a fundamental miscarriage of justice. *Coleman v. Thompson*, 501 U.S. 722, 750, 111 S. Ct. 2546, 115 L. Ed. 2d 640 (1991); *Johnson v. Loftus*, 518 F.3d 453, 455–56 (7th Cir. 2008). Cause exists where "some objective factor external to the defense impeded [the petitioner's] efforts to comply with the State's procedural rule." *Strickler v. Greene*, 527 U.S. 263, 283 n.24, 119 S. Ct. 1936, 144 L. Ed. 2d 286 (1999) (citation omitted) (internal quotation marks omitted). Prejudice exists where the petitioner shows that the violation of his federal rights "worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *Lewis*, 390 F.3d at 1026 (quoting *United States v. Frady*, 456 U.S. 152, 170, 102 S. Ct. 1584, 71 L. Ed. 2d 816

---

"Defendant does not contend the evidence presented was 'closely balanced.'" Doc. 30-1, Ex. A at 38. Serrano's argument thus appears to be correct; however, this Court cannot reach those arguments if the claim does not impact a federal right, which is the case here.

(1982)). The fundamental miscarriage of justice exception is "limited to situations where the constitutional violation has probably resulted in a conviction of one who is actually innocent." *Dellinger v. Bowen*, 301 F.3d 758, 767 (7th Cir. 2002). This requires new, reliable evidence of the petitioner's innocence in light of which "no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt." *Woods v. Schwartz*, 589 F.3d 368, 377 (7th Cir. 2009) (quoting *Schlup v. Delo*, 513 U.S. 298, 329, 115 S. Ct. 851, 130 L. Ed. 2d 808 (1995)).

Here, Serrano did not present claims 2 and 3 through one complete round of state court review. Serrano did argue in his direct appeal to the Illinois Appellate Court that his counsel was ineffective for failing to ensure that prospective jurors were questioned regarding possible gang bias and that the trial court erred when it denied defense counsel's motion to withdraw and did not question petitioner regarding the potential conflict of interest stemming from his counsel's continued representation. However, he did not raise either of those claims in his direct appeal PLA, and he never filed a collateral appeal in state court. In light of this, Serrano's filings on claims 2 and 3 in his direct appeal are not sufficient to avoid procedural default. *See Guest v. McCann,* 474 F.3d 926, 930 (7th Cir. 2007) (to avoid procedural default by way of direct appeal, "a petitioner must have directly appealed to the Illinois Appellate Court and presented the claim in a petition for leave to appeal to the Illinois Supreme Court").

Serrano can nonetheless proceed on his procedurally defaulted claims if he can establish cause and prejudice for the default or that the failure to consider the claim would result in a fundamental miscarriage of justice. *Johnson*, 518 F.3d at 455–56. However, Serrano does not present any argument for why this Court should excuse the default of his second and third claims, and thus this Court need not consider those claims further. *See Crockett v. Hulick*, 542 F.3d 1183, 1193 (7th Cir. 2008).

### III. Non-Defaulted Claim (Claim 1)

Finally, Serrano argues that his trial counsel was ineffective for failing to move to suppress the initial statements he made to Valkner and Bond prior to his videotaped statements, on the basis that those statements were not recorded, were made after the victim died, and were made to interrogators who should have known that the victim died. The Illinois Appellate Court rejected this claim on direct appeal. Serrano cannot show that the Appellate Court's decision on the merits regarding this claim was contrary to, or an unreasonable application of, clearly established federal law.

As the Illinois Appellate Court correctly identified, to establish constitutionally ineffective assistance of counsel, Serrano must show (1) "that counsel's representation fell below an objective standard of reasonableness," and (2) "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 688, 694, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). In considering the first prong, the Court indulges "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance" and may not let hindsight interfere with its review of counsel's decisions. *Id.* at 689. For the second prong, a "reasonable probability" is "a probability sufficient to undermine confidence in the outcome." *Id.* at 694. This means a "substantial," not just "conceivable," likelihood of a different outcome in the case. *Cullen v. Pinholster*, 563 U.S. 170, 189, 131 S. Ct. 1388, 179 L. Ed. 2d 557 (2011) (quoting *Harrington v. Richter*, 562 U.S. 86, 112, 131 S. Ct. 770, 178 L. Ed. 2d 624 (2011)). The Court need not address both prongs of the *Strickland* test if one provides the answer; that is, if the Court determines that the alleged deficiency did not prejudice Serrano, it need not consider the first prong. *Ruhl v. Hardy*, 743 F.3d 1083, 1092 (7th Cir. 2014). In reviewing the Illinois

Appellate Court's decision, the Court must apply a "'doubly deferential' standard of review that gives both the state court and the defense attorney the benefit of the doubt." *Burt v. Titlow*, 571 U.S. 12, 15, 134 S. Ct. 10, 187 L. Ed. 2d 348 (2013) (quoting *Cullen*, 563 U.S. at 190).

Serrano has not shown that the Illinois Appellate Court was unreasonable in rejecting his claim and finding that he did not satisfy the second prong of the *Strickland* test because he could not show that a motion to suppress would have had a reasonable probability of success. Serrano argues that it was objectively unreasonable for his trial counsel not to move to suppress his initial statements made to Valkner and Bond. The Illinois Appellate Court began its analysis of this claim by looking to the plain language of the state statute at the heart of this claim. The statute requires that, for a "statement of an accused made as a result of a custodial interrogation" to be used as evidence in a criminal proceeding for a homicide, the custodial interrogation must be electronically recorded. 725 Ill. Comp. Stat. § 5/103-2.1(b). However, § 103-2.1(e) contains exceptions to that rule, and it specifically provides that nothing in the section is intended to preclude admission of a statement given "at a time when the interrogators are unaware that a death has in fact occurred." 725 Ill. Comp. Stat. § 5/103-2.1(e)(viii). The Illinois Appellate Court then considered Serrano's argument that Valkner and Bond intentionally remained ignorant of Gayden's death, but found "[n]othing in the record" to suggest "either Detective Valkner or ASA Bond intended to maintain 'purposeful ignorance' of the victim's condition in order to ensure they did not have to comply with section 103-2.1." Doc. 30-1, Ex. A at 20. Gayden died slightly over an hour before Valkner questioned Serrano; when Bond arrived at the station, he inquired after Gayden's status but did not wait to hear back before briefly questioning Serrano. Once Valkner and Bond received notice of Gayden's death, they moved Serrano to the police station's video interrogation room and recorded all further interrogations. The Illinois

12

Appellate Court concluded that none of these facts contributed to an inference that the police officer and prosecutor intended to remain "purposely ignorant" of Gayden's status, and thus Serrano's claim was without merit.

Serrano's co-defendant Murithi made the same arguments regarding his own statements to the police officer and prosecutor, both in his direct appeal and his federal habeas appeal, with the same result that the courts have reached in this case. *See United States ex rel. Murithi*, 2015 WL 1399511 at *7 (finding that the appellate court's decision that Murithi's statements were admissible under Illinois law and thus trial counsel was not ineffective for not moving to suppress them was a reasonable application of *Strickland*). Given the plain language of the statute and the lack of facts on the record to support Serrano's argument that Valkner and Bond remained intentionally ignorant of Gayden's status, the Court finds that the Illinois Appellate Court did not unreasonably apply *Strickland* to Serrano's claims of ineffectiveness of counsel regarding the decision not to move to suppress Serrano's initial statements. Thus, Serrano's challenge fails.

## CERTIFICATE OF APPEALABILITY

Pursuant to Rule 11(a) of the Rules Governing § 2254 Cases, the Court must issue or deny a certificate of appealability when it enters a final order adverse to a petitioner. A habeas petitioner is entitled to a certificate of appealability only if he can make a substantial showing of the denial of a constitutional right. *See Miller-El v. Cockrell*, 537 U.S. 322, 327, 123 S. Ct. 1029, 154 L. Ed. 2d 931 (2003) (citing 28 U.S.C. § 2253(c)(2)). To make a substantial showing, the petitioner must show that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'" *Slack v. McDaniel*, 529 U.S.

473, 484, 120 S. Ct. 1595, 146 L. Ed. 2d 542 (2000) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893 n.4, 103 S. Ct. 3383, 77 L. Ed. 2d 1090 (1983)).  The requirement of a certificate of appealability is a threshold issue and a determination of whether one should issue neither requires nor permits full consideration of the factual and legal merits of the claims.  "The question is the debatability of the underlying constitutional claim, not the resolution of that debate." *Miller-El*, 537 U.S. at 342.

For the reasons stated above, the Court finds that there can be no showing of a substantial constitutional question for appeal, as reasonable jurists would not find this Court's rulings debatable.  *See Lavin v. Rednour*, 641 F.3d 830, 832 (7th Cir. 2011) (citing *Slack*, 529 U.S. at 484–85).  Accordingly, the Court declines to issue a certificate of appealability.

## CONCLUSION

For the foregoing reasons, the Court denies Serrano's petition for a writ of habeas corpus pursuant to 22 U.S.C. § 2254 and declines to certify any issues for appeal under 28 U.S.C. § 2253(c).

Dated: November 19, 2018

_____
SARA L. ELLIS
United States District Judge